# Staunton

BARRY CALVIN FADELY v. COMMONWEALTH OF VIRGINIA.

September 8, 1967.

Record No. 6482.

Present, All the Justices.

*J. Sloan Kuykendall* (*H. Garnett Scott; Kuykendall and Whiting*, on brief), for plaintiff in error.

*M. Harris Parker, Assistant Attorney General* (*Robert Y. Button, Attorney General*, on brief), for defendant in error.

SNEAD, J., delivered the opinion of the court.

On October 29, 1965, Barry Calvin Fadely, defendant, was found guilty of involuntary manslaughter as a result of a single car accident in which he was the driver and Steve Randall Whetzel, a passenger, was killed. The jury fixed his punishment at confinement in jail for a period of 6 months and a fine of $500. After overruling defendant's motion to set aside the verdict, the court entered judgment on the verdict. We granted defendant a writ of error.

At approximately 7:30 p.m. on August 28, 1965, Barry Fadely, then age 18, arrived in his mother's 1956 Chevrolet sedan at the home of his friend, Joseph A. Orndorff, located outside of Edinburg. The two boys had earlier planned to get some beer and attend the Luray fair. On the way, Fadely stopped the car on the mountain and Orndorff picked up "about" two six-packs of 3.2 beer which he had previously hidden in a culvert. Both boys consumed some of the beer as they proceeded toward Luray. Fadely drank while operating the vehicle. They did not visit the fair, but instead watched a baseball game in progress for a "few minutes". While in Luray, Orndorff said he drank some beer but that Fadely did not. Upon leaving Luray, they drove through Strasburg and stopped in Woodstock at the "Tastee-Freez" at about 11 p.m. and talked "to the people that was there." By this time all of the beer had been consumed. Orndorff did not "keep count" but estimated that he had drunk "around seven or eight", and that Fadely had drunk about four or five of the beers. Orndorff stated that he felt the effects of the beer "some", and that he could not recall whether either of them had had any food since they left his home that evening.

After leaving Woodstock, the boys stopped for a few moments in Mt. Jackson. They then proceeded to the home of Eileen Lutz located on State Route No. 263, known as Orkney Grade road, a short distance west of Mt. Jackson, because they heard some boys say "it was going to be a party out there, and there wasn't anything else to do, so [we] just rode out." Fadely and Orndorff were un-invited guests and arrived at the Lutz home about midnight. There were three girls and eleven boys in attendance at the party.

Janet Heishman, who had known defendant "[j]ust about all of my life" and considered herself to be a friend of the defendant, was one of the girls attending the party. She testified that when Fadely arrived at the party "[h]is eyes were bloodshot and his hair was all down in his face"; that he asked her to "fix me a place to lie down" because "I don't feel good"; that she "fixed" for him such a place; that he lay down and she took off his shoes.

Miss Heishman stated she later attempted to dance with Fadely but "he couldn't hardly stand up, and I pushed him back up against the wall and I went on dancing." She further testified that she had had nothing to drink,. and that she smelled the odor of alcohol on Fadely's breath and saw him drink two beers while at the Lutz home.

The defendant also produced witnesses who attended the party. They testified that they did not see Fadely drink anything or have the appearance of having been drinking. Several of these witnesses stated on cross-examination that they were good friends of defendant and would not want to say anything that would hurt his case. According to Bobby Shipe, about all of the boys present at the party had been drinking alcoholic beverages.

Fadely, the defendant, testified that he "kept count" and drank only four beers during the entire evening; that he did not drink anything at the Lutz home; that he consumed his last beer in Strasburg, which was about an hour before he arrived at the Lutz home; that he did not feel the effects of the beer; that he did not have trouble with his eyes, "but everybody kids me about them being bloodshot all the time"; that he did not feel ill at the Lutz party, but did lean on his elbows while on the bed; that Janet Heishman did pull off his shoes, and that he had had very little experience in drinking beer.

Fadely stated that "around quarter after 1:00, something like that, 12:30" he left the party with Steve Whetzel and Clyde [Bill] Cooley. "Steve and Bill had just come in * * * [a]nd Bill walked over and asked me if I wanted to go drink a few beers. They said they had some outside, and I said, 'O.K.' He said, 'I will drive,' so I gave him my keys. * * * We kept it quiet, we didn't say anything to anybody, and when I got to the car he had my trunk open, Stevie, putting some beer in the cooler, and he brought three up front." When the boys started to get into the car, defendant said, "I will drive." The car left the Lutz home with Cooley seated in the right front seat and Whetzel sitting in the back seat. Orndorff "was planning on going home" with Fadely and did not know that the boys had left the party.

The automobile, with defendant driving, headed westwardly on Orkney Grade road, a highway that defendant had traveled "three or four times" and which he knew had "a lot of curves in it." Fadely stated that while they were driving Cooley and Whetzel were drinking but he was not. At a point on Orkney Grade road, near Baker's garage, defendant lost control of the automobile on a curve and it ultimately overturned. Both Cooley and Whetzel were thrown from the car and killed.

In describing the accident, the defendant testified: "Well, we were driving along talking, and right before I remember we wrecked, you know, Billy [Cooley] laughed about something, and at the time it was kind of quiet, and I glanced over at him, and I ran off the road, and when I whipped it to get it back on the road it didn't come back, and then I hit the bank." At the time of the accident defendant said that he was driving between 50 and 55 miles an hour and that there was no vehicular traffic approaching him. Immediately following the mishap defendant sought assistance.

Freeman Derwood Green, who lived approximately one mile from the scene of the accident testified that he was awakened by "somebody hollering for help." Upon opening the door of his house he found the defendant who was "dirty and had blood all over him." Defendant asked Green to call for an ambulance. Greene requested his wife to make the call and then went to the accident scene with Fadely. On the way, Green said defendant told him that the accident "happened when he lit a cigarette." Defendant stated that he could not "recall lighting a cigarette" at the time of the accident.

Trooper M. H. Ashley testified that the accident was reported to him at 1:10 a.m. on August 29, and that he immediately proceeded to its location. When he reached the scene, defendant was already in the ambulance. Steve Whetzel was found lying on the north side of the highway in the driveway of Baker's garage. Clyde Cooley was found lying on an embankment. Both Whetzel and Cooley were pronounced dead upon their arrival at the Shenandoah County Hospital. The defendant was admitted to the hospital and treated for a "mild cerebral concussion" and lacerations.

Trooper Ashley described the road at the location of the crash as being in "open country" and having a black top surface with a grade and curve. (Exhibits show that the road has two lanes.) The highway was dry and there were no apparent defects in it. The weather was clear. His investigation disclosed two black tire marks twelve feet long that led off the right side of the westbound lane of Route 263. The marks then continued on the shoulder for a distance of 129 feet to a sloping six-foot embankment, which was "gouged" by the vehicle. The tracks and marks then led around the embankment ranging between the ditch line and the top of the bank until they crossed to the opposite side of the highway. At the end of the marks Ashley found the Fadely vehicle against the south bank of the highway resting on its left side. The marks made by the car were continuous and measured a distance of 324 feet.

The car was demolished. Ashley discovered glass, parts of a beer cooler, the automobile seats and debris scattered along the bank and road. He also found a cool unopened can of beer which was later identified by Janet Heishman as the type she had seen defendant drinking at the Lutz home.

According to Calvin Fadely, defendant's father, the curve which defendant failed to safely negotiate was one of approximately ten degrees. As defendant approached the curve there was a clearly visible highway marker indicating the curve ahead. Calvin Fadely said the distance between it and the curve was 204 yards.

[1] Among his assignments of error, defendant asserts that the trial court erred in overruling his motion to set aside the jury verdict as being contrary to the law and evidence because the evidence was legally insufficient to establish criminal negligence.

" 'Involuntary manslaughter is the killing of one accidentally, contrary to the intention of the parties, in the prosecution of some unlawful, but not felonious, act; or in the improper performance of a lawful act. * * * ' " *Mundy* v. *Commonwealth,* 144 Va. 609, 615, 131 S.E. 242; *Massie* v. *Commonwealth,* 177 Va. 883, 886, 15 S. E. 2d 30.

In *Zirkle* v. *Commonwealth,* 189 Va. 862, 868, 55 S.E. 2d 24, this court stated:

"We have held in numerous cases that the negligence required to be proven in a criminal proceeding must be more than the lack of ordinary care and caution. It must be something more than mere inadvertence or misadventure. As Mr. Justice Spratley said in *Bell* v. *Commonwealth,* 170 Va. 597, 611, 195 S.E. 675, 'It (criminal negligence) is a recklessness or indifference incompatible with a proper regard for human life. It must be shown that a homicide was not improbable under all of the facts existing at the time, and that the knowledge of such facts should have had an influence on the conduct of the offender. 99 A.L.R. 829; 5 Am. Jur. 927; *Cain* v. *State,* 55 Ga. App. 376, 190 S.E. 371.' "

[2] In the present case, the evidence was conflicting. The jury, who saw and heard the witnesses testify, by its verdict resolved all conflicts in the evidence adversely to the defendant. The verdict was fortified by the approval of the court below. When the sufficiency of the evidence is challenged, we must view the evidence which tends to support the verdict and uphold the verdict unless it is plainly wrong or without evidence to support it. *Miles* v. *Commonwealth,* 205 Va. 462, 468, 138 S.E. 2d 22.

The jury could have concluded from Janet Heishman's testimony that defendant was under the influence of intoxicants. She said that when Fadely arrived at the party he asked her to "fix me a place to lie down" because "I don't feel good"; that he lay down on the bed and she took off his shoes; that later she attempted to dance with him, but "he couldn't hardly stand up, and I pushed him back up against the wall * * *"; that she smelled the odor of alcohol on his breath, and that she saw him drink two beers before he drove off with Cooley and Whetzel. The accident occurred a few moments after he left the Lutz home.

Moreover, Fadely, despite his knowledge that the road had "a lot of curves in it" and the presence of a highway sign which warned of an approaching curve, entered the curve in the nighttime at a speed which he said was between 50 and 55 miles an hour with his eyes cast away from the road. He testified that he "glanced" at Cooley, ran off the road and hit the bank, but Green said that Fadely told him that the accident "happened when he lit a cigarette." Even though Fadely said that he was traveling between 50 and 55 miles an hour, the jury could have concluded from the physical evidence presented that he was going faster. The car traveled a distance of 324 feet from the point on the road where the two black tire marks began and where it overturned on the south or opposite side of the highway. The car was demolished. Parts of it and debris were scattered along the bank and road.

Under the evidence adduced, we cannot say, as a matter of law, that the evidence was insufficient for the jury to find that the defendant was at the time of the mishap operating his vehicle in a manner which showed "recklessness or indifference incompatible with a proper regard for human life", and thus guilty of criminal negligence.

[3] Defendant next contends that the trial court erred in overruling his motion to set aside the verdict of the jury and grant him a new trial on the ground that one of the jurors resided within two miles of the place where the crime is alleged to have been committed.

When the prospective jurors were examined upon their *voir dire*, counsel for defendant asked if any of them lived "within two miles of the alleged scene of the crime", which was described by the Commonwealth's attorney as at a point "[s]even-tenths of a mile west of Mount Clifton on the Orkney Grade road in Shenandoah" county. One juror raised his hand and indicated that he resided within two miles of the scene and was excused from duty by the court. The

other prospective jurors remained silent. After counsel had exercised their peremptory challenges, the names of the 12 jurors selected were read by the clerk and the court asked counsel whether they were satisfied with the jury. Both counsel responded in the affirmative and the trial proceeded.

After the verdict of guilty was rendered by the jury, counsel for defendant moved to set it aside as being contrary to the law and evidence and for errors committed by the court. Argument on the motion was heard on December 18, 1965. During argument counsel for defendant pointed out to the court for the first time that Raymond N. Showman, a juror who sat in the trial of the case and acted as foreman, lived within two miles of the scene of the crime. He stated that he learned of this fact after the verdict and the discharge of the jury. He contended Showman was disqualified as a juror under the provisions of Code, § 19.1-211. It was stipulated by the Commonwealth that Showman did live within two miles of the scene. The trial court refused to set aside the verdict.

Section 19.1-211 provides:

"No person residing within two miles of the place where the crime is alleged to have been committed shall be allowed to serve as a juror in any felony case in the circuit court of any county; provided, however, that the impanelling of such a juror shall not be cause for summoning a new panel, or for setting aside a verdict or granting a new trial, unless objection thereto specifically pointed out is made before the jury is sworn; and provided further, however, that such a juror may be impanelled and serve in any county having a population in excess of ninety-five thousand or in any county containing a town, the population of which is more than half the entire population of the county, or in any county in which a military reservation is located in whole or in part."

The defendant argues, among other things, that the statute makes it mandatory that no person residing within two miles of the place of the alleged offense shall serve as a juror; that it must be assumed that the General Assembly considered that such persons "could not be impartial and render a true verdict", and that defendant was denied his constitutional right to a trial by an impartial jury as guaranteed by Article 1, Section 8 of the Constitution of Virginia.

The defendant recognizes the provision in the statute which states that "the impanelling of such a juror shall not be cause for * * * setting aside a verdict or granting a new trial, unless objection thereto

specifically pointed out is made before the jury is sworn". However, he argues that if a juror who lives within two miles of the place of an alleged offense is allowed to serve on a jury, it is mandatory that the conviction be set aside, unless it appears from the record that the accused had notice of the fact at the time the jury was impaneled and failed to make timely objection. We do not agree.

Section 19.1-211 is clear and unequivocal. It specifically states that a verdict shall not be set aside on the ground that a juror resided within two miles of the place where the crime is alleged to have been committed "unless objection thereto specifically pointed out is made before the jury is sworn." The burden rested solely upon defendant to object and show that juror Showman resided within the two mile limit before the jury was sworn. This he did not do and his objection came too late.

What was said in *McDaniel* v. *Commonwealth*, 165 Va. 709, 722, 181 S.E. 534 is applicable here:

"Ample protection is given to the accused. Before the trial he may satisfy himself as to who the possible jurors are and where they live.[1] He cannot sleep upon his rights and complain only after conviction."

In his remaining assignments of error, defendant contends that the trial court erred (1) in granting and refusing certain instructions; (2) in overruling his motion for a mistrial on account of the admission of prejudicial evidence, and (3) in overruling his motion for a new trial on account of alleged improper and inflamatory remarks made by the Commonwealth's attorney in his argument to the jury. Suffice it to say, we have carefully examined each of these assignments and find no prejudicial error.

Accordingly, the judgment appealed from is

*Affirmed.*

---

[1] § 19.1-203—"Every sheriff and city sergeant, after executing a writ of venire facias for a petit jury, shall prepare a list showing the name, occupation and address of each venireman summoned and shall deliver the list to the clerk of the court from which such writ is issued. The clerk, upon request, shall exhibit such list to the parties or counsel; but no inaccuracy in the list shall constitute error."